IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
v.                              )       CRIMINAL NO. 08-00204-KD
                                )       (Civil Action No. 09-00734-KD-N)
DANIEL STUART ADDISON,          )
                                )
        Defendant.              )

REPORT AND RECOMMENDATION

This action is before the Court on Defendant/Petitioner Daniel Stuart Addison's

motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (doc. 65-

66), reinstated on January 22, 2010 (doc. 89) and thereafter supplemented (doc. 95, 101).

This matter has been referred to the undersigned Magistrate Judge for entry of a report

and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Upon consideration of the

petitioner's § 2255 motion, the Government's responses in opposition thereto (doc. 97,

103) and petitioner's reply brief (doc. 104), as well as all other pertinent portions of the

record, it is the recommendation of the undersigned that the § 2255 motion be **DENIED**.

I.      BACKGROUND

A.      Procedural History

In May 2008, Daniel Stuart Addison was charged in a one-count indictment with

being a felon[1] in possession of a firearm [2] in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).

---

[1] The indictment charged Addison with having been convicted of the following six crimes,
punishable by imprisonment for a term exceeding one year: Burglary Second Degree, in the Circuit Court
of Escambia County, Alabama, case number CC 2007-517 on September 27, 2007; Possession of a
(Continued)

Addison was convicted after a one day trial on August 4, 2009. (Docs. 23, 51). Prior to

sentencing, Addison's trial attorney, F. Luke Coley, filed a motion for new trial and

represented that he had spoken by telephone to the Honorable Ashley McKathan, Judge

of the Circuit Court in Covington County, Alabama, who relayed information that called

into question the credibility of Roman Pierce, a witness for the United States. (Doc. 29).

Coley stated that Judge McKathan told him the following:

> Mr. Pierce came to live with Judge McKathan and his family sometime in
> 2008 through persons in Judge McKathan's church. On the day after Mr.
> Pierce returned to Andalusia from Mr. Addison's trial in Mobile, Mr. Pierce
> approached Judge McKathan and made a statement regarding his (Mr.
> Pierce's) testimony. Mr. Pierce stated that the prosecutor and agent who
> prepped him told him he shouldn't lie but that he should stretch the truth
> about the means of the transfer of the weapon; in truth, Mr. Pierce was not
> present when Mr. Addison took possession of the weapon, but that Mr.
> Pierce had actually given the weapon to Mr. Hall. Therefore, Mr. Pierce did
> not witness the actual taking of possession of the weapon by Mr. Addison.

(Doc. 29 at 2). As a result, attorney Coley contacted Pierce by telephone and asked

Pierce if he had recanted his trial testimony. Pierce denied having recanted his testimony.

*Id.* In the motion, Coley argued that the "newly discovered evidence" from Judge

McKathan regarding Pierce's alleged post-trial recantation and post-trial allegations of

governmental misconduct – which neither he nor Addison knew prior to the trial –

---

Forged Instrument Second Degree, in the Circuit Court of Escambia County, Alabama, case number CC
2004-165 on May 19, 2004; Breaking and Entering a Motor Vehicle, in the Circuit Court of Escambia
County, Alabama, case number CC 1999-431, on October 15, 1999; Unlawful Breaking and Entering a
Motor Vehicle, in the Circuit Court of Conecuh County, Alabama, case number CC 1999-061, on October
26, 1999; Theft of Property First Degree, in the Circuit Court of Escambia County, Alabama, case number
CC 1996-292, on September 3, 1997; and Theft of Property First Degree, in the Circuit Court of
Escambia County, Alabama, case number CC 1996-30, on December 4, 1996. (Doc. 1).

[2] The firearm was a Norinco, Model SKS, 7.62 x 39 mm rifle. (Doc. 1).

necessitated a new trial. *Id.* at 3. The United States opposed the motion, arguing *inter alia* that the jury's verdict should stand since "even in the complete absence of Pierce's testimony, the United States presented substantial evidence of the defendant's constructive possession of the subject gun." (Doc. 34 at 4-5). The District Court denied the motion on the grounds that Addison had failed to meet his burden of showing that the outcome would be different "should the impeaching evidence be presented at a new trial." (Doc. 35 at 1). The Court specifically held:

> Although defendant argues that the recanting witness' trial testimony was material to the issue of whether defendant had actual possession or ownership of the gun, the United States' case was based upon constructive possession. In that regard, the United States presented substantial evidence of defendant's constructive possession of the subject gun through the testimony of the investigators, the witness to the showing of the gun by defendant, and the testimony of defendant's step-father.

(*Id.* at 1-2).

On December 16, 2008, Addison was sentenced to a 120-month term of imprisonment and a three-year term of supervised release. (Docs. 23, 38, 52). During the sentencing hearing, this Court gave Addison the opportunity to "say anything" he wished, but Addison elected not to speak. (Doc. 52 at 11). Neither Addison nor his attorney mentioned Pierce's alleged recantation or any alleged governmental misconduct. (Doc. 52).

Addison's conviction was affirmed by the Eleventh Circuit Court of Appeals on October 16, 2009. (Doc. 69). The Eleventh Circuit Court of Appeals summarized Addison's sole issue on appeal as: whether there was sufficient evidence for a reasonable jury to find Addison guilty because the United States failed to establish that at the time of

the search he was in actual or constructive possession of the SKS rifle or had control over the premises where it was found. (Doc. 69 at 2). In affirming Addison's conviction, the Eleventh Circuit held:

> A reasonable jury could have concluded that Addison was in knowing possession of a firearm in violation of § 922(g)(1). The government introduced evidence at trial tending to show that Addison had actual possession of the SKS rifle. George McIntyre, an acquaintance of Addison, testified that Addison showed him the rifle at Stokes' residence in December, 2007. The search warrant of Stokes' residence was executed on December 11, 2007 at which time the rifle was seized. Viewing the evidence in the light most favorable to the government, McIntyre's testimony suggested that Addison had physical possession of the rifle only days before the search warrant was executed and the rifle was seized. The government thus introduced evidence from which a reasonable jury could have found that Addison was in actual possession of the rifle "on or about" December 11, 2007 as charged in the indictment. *See* United States v. Pope, 132 F.3d 684, 689 (1998) (concluding that September 17, 1994 and October 4, 1994 were "reasonably near to October 7, 1994 so as to be 'on or about' that date").

> The government also introduced evidence at trial tending to establish that Addison had constructive possession of the SKS rifle. The evidence showed that at the time the search warrant was executed Addison at least maintained a bedroom at Stokes' residence and had access to the shed where the rifle was recovered. Based on that, a reasonable jury could have found that Addison "exercised ownership, dominion or control" over the SKS rifle or the shed where it was kept and thus it was within his constructive possession. Gunn, 369 F.3d at 1234. Accordingly, we affirm Addison's conviction.

(Doc. 69 at 4-5).

While his appeal was pending, Addison filed *pro se* a "Federal Complaint/U.S. Attorney's Office, Government Misconduct/Writ of Conspiracy" and a "Request to Amend Federal Complaint and Add a Sworn Statement." (Docs. 60, 63). Both of these filings were stricken for lack of jurisdiction. (Docs. 62, 64).

On November 9, 2009, before the Eleventh Circuit mandate issued, Addison filed a § 2255 motion to vacate his sentence. (Docs. 65, 66). The Eleventh Circuit's mandate issued on November 16, 2009 (doc. 69) and on January 22, 2010, this Court granted Addison's request to reinstate his § 2255 motion. (Doc. 89).[3] On March 31, 2010, the United States filed a response to Addison's § 2255 motion. (Doc. 94). Thereafter, Addison filed a motion for permission to supplement or amend his § 2255 petition (doc. 95), which was granted on May 7, 2010 (doc. 101). The issues have now been fully briefed. (Docs. 94, 103, 104).

B.    Summary of Trial Evidence.

The following facts are derived from the summary of the trial evidence presented by the United States in its brief to the Eleventh Circuit Court of Appeals during Addison's direct appeal. *See* Doc. 94 at 3-8. Addison has not disputed the contention that the United States presented such a summary to the Eleventh Circuit. Nor does Addison contend that this summary is not consistent with the evidence presented at trial. Accordingly, the summary is incorporated *verbatim* herein:

Execution of a search warrant at Addison's residence.

The relative tranquility of the tiny hamlet of Castleberry, Alabama (Conecuh County) was temporarily interrupted on December 11, 2007, when a

_____

[3] During the pendency of this § 2255 motion, Addison has filed multiple motions, including, *inter alia*, a motion for ex parte injunction & investigation (doc. 71); two requests for a copy of his file or a document in his file (doc. 74, 81); an ex parte motion to replace the prosecutor (doc. 75); a motion to reinstate his § 2255 motion (doc. 76); a motion for a bond hearing (doc. 77); a motion to appoint counsel (doc. 83); a motion to require counsel to send to him his file (doc. 87); a motion for clarification regarding the reinstatement of his § 2255 motion (doc. 88); and a motion to compel an investigation (doc. 105). Each of these motions has been denied. (Docs. 72, 78, 79, 85, 89, 90, 91, 106)

search warrant was executed at Addison's residence located at 2308 Baggett Road. Doc. 51 at 15; PSI, p. 3, ¶ 5. Addison intermittently lived there in the 70-foot mobile home with his mother Linda Stokes, and his step-father George Stokes. Though Addison from time to time stayed with various girlfriends, he was living with his parents on the day of the search.[4]

> FN 4. Sean Klaetsch, Chief Detective of the Evergreen, Alabama, Police Department, was familiar with the various places that Addison resided, but testified that "the main place he stayed was at his mother's house on Baggett Road." Doc. 51 at 88. George McIntyre, a resident of Castleberry, who has known Addison since the early 1990's, testified at trial that in December of 2007 Addison was living with his mother, Linda Stokes. Doc. 51 at 49-50.

At that time, Addison was only 30 years of age, but he had been busy as a thief and burglar, and had amassed a substantial criminal record. [See, The Defendant's Criminal History, PSI, pp, 6-11, ¶¶ 26-44.][5] On the date of the search, law enforcement authorities were again looking for property that he had stolen. Doc. 51 at 16. These efforts ultimately proved to be successful.

> FN 5.  Addison stipulated at trial that he had been convicted of a felony punishable for imprisonment for a period exceeding one year. Doc. 51 at 91-92.

Only Addison's mother was at the residence when the search began, with George Stokes arriving later. *Id*. at 18. After the search team, mostly comprised of deputies of the Conecuh County Sheriff's Department, identified themselves they informed Mrs. Stokes of the purpose of the search, and gave her a copy of the warrant. *Id*. at 19. Mrs. Stokes showed the deputies a room that she identified as being her son Daniel's bedroom, and told them that they could begin there. Id. at 20. Several items were recovered from Addison's room, including two stolen rugs that had been taken in a burglary that was under investigation. *Id*. at 34-35.[6]

> FN 6. A stolen antique dagger was also found outside the residence. Doc. 51 at 20.

Meanwhile, deputies searching outside in an open-ended shed near the residence found a Norinco, model SKS, 7.62 x 39 mm, assault-type rifle along with a 30-round "banana" clip inside a plastic bag that was hidden behind some insulation. *Id*. at 27-29. At the time the weapon was found it was missing the bolt containing the firing pin that allowed the gun to discharge a round, or in other words — to shoot. *Id.* at 23, 35-36. When the deputies returned inside the residence with the firearm, Mrs. Stokes retrieved the bolt from inside a candy dish.

*Id.* at 35-36. Mrs. Stokes did not provide any type of documentation to the officers at that time concerning her purported ownership of the firearm. *Id.* at 22.

Coincidentally, there were plenty of other firearms found inside the residence. In fact, there were two unlocked gun cabinets filled with firearms, including hunting rifles and two pistols found in a drawer.[7] *Id.* at 20-21. However, Linda Stokes testified that one cabinet was locked and the other unlocked. Doc. 51 at 110. But even she did not deny that there was one unlocked gun cabinet located approximately 55 feet from Addison's room. *Id.* at 111.

> FN 7. One handgun was a 9 mm, and the other was a .357 magnum
> caliber. Doc. 51 at 20-21.

From China to Castleberry — the firearm's long journey.

The Norinco, Model SKS, 7.62 x 39 mm rifle, the possession of which was the subject matter of the indictment in this case, was manufactured by China North Industries, in the People's Republic of China. PSI, p. 4, ¶ 8. It was then imported into the United States by Poly USA, in Atlanta, Georgia. Id.[8] Somewhere along the way, Roman Pierce, a truck driver by occupation, bought the SKS from an unnamed friend for $50. Doc. 51 at 58-59.

> FN 8. Addison also stipulated at trial that the firearm traveled in
> interstate commerce. Doc. 51 at 91-92.

During the summer of 2007, due to job-related logistics, Pierce was staying with a friend named Lamar Hall. Doc. 51 at 56. Hall lived in Brooklyn, Alabama, which is nestled between Andalusia, Alabama, and Castleberry.[9] *Id.* at 58. It was during this time that Hall introduced Addison to Pierce. *Id.* at 56. Hall bought a truck from Addison, and the two had towed it to Hall's residence, where Addison happened to see Pierce with the SKS rifle. *Id.* at 59. Addison immediately wanted to purchase it. Id. Eventually, Pierce relented and sold it to Addison for $200. *Id.* Pierce handed the SKS rifle directly to Addison at the end of Hall's driveway. *Id.* at 61. Addison gave Hall the $200 in cash to give to Pierce a few days later. Id. at 60. Pierce did not give Addison a receipt or bill of sale. *Id.* at 60, 70.[10]

> FN 9. Certainly this community is not to be confused with
> Brooklyn, New York, size wise. Pierce commented that "you blink
> your eye balls and you are through it." Doc. 51 at 58.

> FN 10. Whether there was a true receipt or bill of sale for the
> weapon became an important issue during the course of the trial.
> Addison's mother, Linda Stokes fabricated a defense for her

son which implied that she had purchased the assault rifle from Lamar Hall, and that he had given her such a document. As noted previously, Hall purchased a truck from Addison, who had also provided him with the title to the vehicle. Doc. 51 at 70-71. Hall's daughter subsequently lost the title while cleaning. Id. In an attempt to obtain another, Hall went to Addison's residence and asked his mother, Mrs. Stokes, about the possibility of obtaining a replacement. *Id*. at 71-72. She acquiesced in Hall's request, but only in return for a bill of sale for the SKS rifle. *Id.* at 73-76. Hall faxed her the bill of sale for the firearm on January 12, 2008, approximately one to two weeks after their meeting, and coincidentally — approximately one month after the search warrant was executed. *Id.* at 77-78.

Addison displays his gun.

Addison was evidently proud of his acquisition. He showed it to at least two different people, on two separate occasions. One of those individuals, Justin Baker, was introduced to Addison by a friend in approximately August of 2007. Id. at 39-40. Baker helped Addison move some of Addison's belongings, mostly clothes, to his mother's mobile home in Castleberry. *Id*. at 41-42. While Baker was there, Addison disappeared momentarily down the hall of the residence and returned with the SKS rifle. *Id*. at 42-45. Baker related that Addison unfolded the weapon, removed the clip, and bragged to him how large a caliber it was. *Id*. at 45. Addison then went back down the hall with the firearm. *Id*. at 46.

George McIntyre, mentioned previously, was also an acquaintance of Addison's. McIntyre visited Addison at his mother's residence in December of 2007. *Id*. at 50. McIntyre related that Addison had been living with his girlfriend, Summer Willis, for a couple of months but had moved back home by then. Id. at 52-53. During his visit, McIntyre and Addison were sitting on the front porch when Addison went into the residence and returned with the SKS rifle exclaiming to McIntyre, "Look at this!" *Id*. at 51-52. McIntyre recalled that the 30-round magazine clip was absent when Addison showed the gun to him. *Id*. at 52.

Addison's mother and step-father tell divergent stories of how the SKS rifle finally found its way to the shed behind their residence.

As previously noted, Addison's mother, Linda Stokes, maintained at trial that she purchased the SKS rifle. *Id*. at 112. She also claimed that she had her husband, George Stokes, put the firearm in the outside shed until she could find the time to take it to the sheriff's office to see if it was legal for her to possess. *Id.*

at 112, 114. According to Mrs. Stokes, there the SKS waited from March of 2007 until the following December. *Id*. at 113.

However, the United States called George Stokes as its only rebuttal witness — and he told another story. Mr. Stokes testified that he did not put the SKS rifle in the outside shed. *Id*. at 117. He related that the only time he had seen the firearm, it was lying on the table on one occasion when Addison was there. *Id*. at 116.

(Doc. 94 at 3-8).

        C.     <u>Habeas Claims</u>.

Addison raises the following claims in his motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, as amended:

1. Ineffective assistance of counsel and government misconduct. Addison asserts that "the key witness (Pierce) was told to stretch the truth to the Grand Jury, Petitie [sic] Jury, and the District Court to get a conviction."[4]

2. Ineffective assistance of counsel for failing to file a motion to suppress the testimony of government witness Roman Pierce. Addison asserts that his counsel was ineffective for failing to conduct reasonably adequate pretrial investigations, and that his counsel knew or should have known of witness Pierce's untruthfulness.

3. Ineffective assistance of counsel at trial and on direct appeal. Addison maintains the arrest warrant and search warrant were based on false information from witness Pierce and that attorney Coley was aware of this false information but refused to provide an affidavit to the District Court and the Eleventh Circuit Court of Appeals. He also claims that his counsel's neglect at sentencing resulted in a longer prison sentence.[5]

---

[4] In his reply, Addison describes this claim as "ineffective assistance of counsel as to prosecutorial misconduct and lack of objections." (Doc. 104 at 3).

[5] In his reply, Addison describes this claim as "ineffective assistance of counsel as to due process at trial and appeal." (Doc. 104 at 3).

4.  Addison contends that County Judge McKathan's affidavit shows that Lamar Hall, another witness for the United States, testified falsely, and that the United States knowingly suborned Hall's perjury at trial.[6]

(Docs. 65, 66, 95).  The United States contends that each of Addison's claims is procedurally defaulted and that Addison has failed to establish cause or prejudice to excuse the default of his claim.  (Docs. 94, 103).  Addison has now expressly abandoned[7] all claims except the following:

1.   "[I]neffective assistance of counsel as to due process at . . . appeal." (Doc. 104 at 3).

2.   "[W]hether the Government knowingly used, solicited, and capitalized on perjured testimony of Roman Pierce, and Lamar Hall during trial and during opening and closing statements."  (*Id.*).

## II.    STATEMENT OF THE LAW

A.   <u>Habeas Standard</u>.

The limited scope of habeas relief is well established:

> Collateral relief is an extraordinary remedy which "may not do service for a [ ] [direct] appeal." <u>United States v. Frady</u>, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *see also* <u>Lynn v. United States</u>, 365 F.3d 1225, 1232 (11th Cir. 2004) ("Courts have long and consistently affirmed

---

[6] Addison, in his reply, describes his "motion to amend/correct the pending Section 2255 motion" as raising these two claims: (4) Petitioners post-trial discovery of an affidavit from Covington County Judge Ashley McKathan shows that both Roman Pierce and Lamar Hall testified falsely at trial and that the government knowingly used, solicited, and capitalized on perjured testimony during its opening and closing arguments; and, (5) whether the Government knowingly used, solicited, and capitalized on perjured testimony of Roman Pierce, and Lamar Hall during trial and during opening and closing statements."  (Doc. 104 at 3).

[7] Addison concedes that he "cannot overcome the Government's Response to Grounds 1 and 2, and he is voluntarily abandoning those grounds for relief."  (Doc. 104 at 3).

that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal."). A defendant who has waived or exhausted his right to appeal is presumed to stand "fairly and finally convicted." <u>Frady</u>, 456 U.S. at 164. Unless a claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained extremely limited. <u>United States v. Addonizio</u>, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). Consequently, "[i]f issues are raised and considered on direct appeal, a defendant is thereafter precluded from urging the same issues in a later collateral attack. . . . A defendant is, of course, entitled to a hearing of his claims, but not to duplicate hearings. The appellate process does not permit reruns." <u>Moore v. United States</u>, 598 F.2d 439, 441 (5th Cir. 1979).

<u>United States v. Evans</u>, 2008 WL 3200694 at *3 (S.D. Ala. 2008). The Eleventh Circuit

Court of Appeals has explained the limited nature of habeas relief, in part, as follows:

> Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal. *See, e.g.*, <u>United States v. Frady</u>, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (collecting cases).[] Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, <u>Mills v. United States</u>, 36 F.3d 1052, 1055 (11th Cir.1994); [] and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.' " <u>Richards v. United States</u>, 837 F.2d 965, 966 (11th Cir.1988) (*quoting* <u>United States v. Capua</u>, 656 F.2d 1033, 1037 (5th Cir. Unit A Sep.1981)). Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, <u>Frady</u>, 456 U.S. at 165, 102 S.Ct. at 1593, unless the error (1) could not have been raised on direct appeal and (2) would, if condoned, result in a complete miscarriage of justice. <u>Stone v. Powell</u>, 428 U.S. 465, 477 n. 10, 96 S.Ct. 3037, 3044 n. 10, 49 L.Ed.2d 1067 (1976).

<u>Lynn v. United States</u>, 365 F.3d 1225, 1232-33 (11th Cir. 2004)(internal footnotes

omitted).

   B.   <u>Procedural Default</u>.

"Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." Lynn v. United States, 365 F.3d 1225, 1234 (11th Cir. 2004).  The Eleventh Circuit Court of Appeals has summarized the procedural default principle as follows:

> Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a § 2255 challenge.  Mills v. United States, 36 F.3d 1052, 1055 (11th Cir. 1994). A defendant cannot overcome this procedural bar unless he can demonstrate a cause for this default and show actual prejudice suffered as a result of the alleged error. *Id.*  In the alternative, a defendant can also overcome the procedural bar created by the failure to appeal if he could show a fundamental miscarriage of justice; "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.* (*quoting* Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).

United States v. Montano, 398 F.3d 1276, 1279-80 (11th Cir. 2005).   The Eleventh Circuit has also explained:

> Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal. *See, e.g.,* United States v. Frady, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (collecting cases). [Footnote omitted]. Because collateral review is not a substitute for a direct appeal, the general rules have developed that: (1) a defendant must assert all available claims on direct appeal, Mills v. United States, 36 F.3d 1052, 1055 (11th Cir. 1994)[footnote omitted]; and (2) "[r]elief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.' " Richards v. United States, 837 F.2d 965, 966 (11th Cir. 1988) (*quoting* United States v. Capua, 656 F.2d 1033, 1037 (5th Cir. Unit A Sep. 1981)). Accordingly, a non-constitutional error that may justify reversal on direct appeal does not generally support a collateral attack on a final judgment, Frady, 456 U.S. at 165, 102 S.Ct. at 1593, unless the error (1) could not have been raised on

> direct appeal and (2) would, if condoned, result in a complete miscarriage
> of justice. Stone v. Powell, 428 U.S. 465, 477 n. 10 (1976).

Lynn v. United States, 365 F.3d at 1232-33.

"A defendant can avoid a procedural bar only by establishing one of the two exceptions to the procedural default rule[:]" (1) when the defendant shows "cause for not raising the claim of error on direct appeal and actual prejudice from the alleged error[;]" or (2) when the defendant shows that he is "actually innocent." Id. The procedural default rule is designed "to conserve judicial resources" and to promote "respect [for] the law's important interest in the finality of judgments." Massaro v. United States, 538 U.S. 500, 504, (2003). Accordingly, any grounds raised here that could have been raised on appeal are procedurally defaulted unless [Addison] can establish cause and prejudice excusing his default (or establish his actual innocence of the crime). 365 F. 3d at 1234 ( citing Bousley v. United States, 523 U.S. 614, 622 (1998)); United States v. Nyhuis, 211 F.3d 1340 (11th Cir.2000). However, claims of ineffective assistance of counsel fall outside of the procedural default rule and, in most cases, are properly raised for the first time in a habeas petition. Id. at 504; As the Supreme Court held in McCleskey v. Zant, 499 U.S. 467 (1991), "[a]ttorney error short of ["constitutionally'] ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default." 499 U.S. at 494, citing Murray v. Carrier, 477 U.S. 478, 486-88 (1986). "Once the petitioner has established cause, he must show 'actual prejudice' resulting from the errors of which he complains." Id., quoting United States v. Frady, 456 U.S. 152, 168 (1982).

C.       Strickland v. Washington Standard.

A two-fold analysis is applied to claims of ineffective assistance of counsel as

follows:

> To succeed on a claim of ineffective assistance, a habeas petitioner
> must satisfy both prongs of the test set out by the Supreme Court in
> Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
> (1984). The performance prong requires a petitioner to establish that
> counsel performed outside the wide range of reasonable professional
> assistance and made errors so serious that he failed to function as the kind
> of counsel guaranteed by the Sixth Amendment. *Id.* at 687-89, 104 S.Ct. at
> 2064-65. The prejudice prong requires a petitioner to demonstrate that
> seriously deficient performance of his attorney prejudiced the defense. *Id.*
> at 687, 104 S.Ct. at 2064.
>
> Unless a petitioner satisfies the showings required on both prongs,
> relief is due to be denied. *Id.* As a result, once a court decides that one of
> the requisite showings has not been made it need not decide whether the
> other one has been. *Id.* at 697, 104 S.Ct. at 2069 (A court need not "address
> both components of the inquiry if the [petitioner] makes an insufficient
> showing on one."); Duren v. Hopper, 161 F.3d 655, 660 (11th Cir. 1998)
> ("if a defendant cannot satisfy the prejudice prong, the court need not
> address the performance prong"). . . .
>
> To establish prejudice, a petitioner must show "there is a reasonable
> probability that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different." Strickland, 466 U.S. at 694, 104
> S.Ct. at 2068. A "reasonable probability is a probability sufficient to
> undermine confidence in the outcome." *Id.* "[P]etitioners must affirmatively
> prove prejudice because '[a]ttorney errors come in an infinite variety and
> are as likely to be utterly harmless in a particular case as they are to be
> prejudicial. [T]hat the errors had some conceivable effect on the outcome of
> the proceeding' is insufficient to show prejudice." Gilreath v. Head, 234
> F.3d 547, 551 (11th Cir. 2000) (alteration in original) (*quoting* Strickland,
> 466 U.S. at 693, 104 S.Ct. at 2067).

United States v. Butcher, 368 F.3d 1290, 1293-94 (11th Cir. 2004). In making the

performance determination, conduct must be evaluated from the attorney's perspective at

the time in order to avoid the distorting effects of hindsight.  <u>Strickland</u>, 466 U.S. at 689.

As the Eleventh Circuit has more recently held:

> To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's performance was deficient, and (2) this deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient if he does not provide reasonably effective assistance. <i>Id.</i>, 104 S.Ct. at 2064. "Judicial scrutiny of counsel's performance must be highly deferential." <i>Id</i>. at 689, 104 S.Ct. at 2065. In evaluating an attorney's conduct, a court must avoid "the distorting effects of hindsight" and must "evaluate the conduct from counsel's perspective at the time." <i>Id</i>., 104 S.Ct. at 2065.

<u>Payne v. United States</u>, 566 F.3d 1276, 1277 (11th Cir. 2009).

Once a court decides that one of the requisite showings has not been made it need not decide whether the other one has been. <u>Strickland</u>, 466 U.S. at 697 (A court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one."); <u>Duren v. Hopper</u>, 161 F.3d 655, 660 (11th Cir. 1998) ("if a defendant cannot satisfy the prejudice prong, the court need not address the performance prong"). Given this exacting burden, "the cases in which habeas petitioners can properly prevail . . . are few and far between." <u>Waters v. Thomas</u>, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc). With this legal framework in mind, the court now turns to the specific issues raised by petitioner in his habeas motion.

### III.    ANALYSIS.

As stated above, Addison has abandoned all claims except ineffective assistance of counsel on appeal and prosecutorial misconduct during the opening and closing statements at petitioner's trial.  As a threshold matter, the court notes that in support of

his argument, Addison relies on a mischaracterization of the affidavit testimony of Judge

McKathan.  Addison's version of the affidavit is as follows:

> The day after Petitioner was convicted, Pierce confided in the person,
> Covington County Circuit Court Judge Ashley McKathan, in which he had
> been staying.  During this conversation, Pierce confessed to Judge
> McKathan that he had lied at Petitioner's trial, because he had been told by
> the Government "to stretch the truth."  Pierce told Judge McKathan that he
> believed that Hall had sold Petitioner the gun, but this was contrary to his
> testimony at Petitioner's trial.  Pierce did not know if Hall had sold the rifle
> to Petitioner [or Mrs. Stokes], because he told Judge McKathan that he was
> not present when the sale was consummated."

(Doc. 104 at 5).  In contrast to Addison's characterization of the testimony, Judge

McKathan only stated as follows:

> During the abovementioned ride to work, Roman [Pierce] told me that: He
> was not present when Daniel Addison took possession of the firearm
> involved in the above prosecution, because he (Roman) had gone to work.
> Instead, he believed that one Lamar Hall, a friend of his, had made the
> transfer to Addison in his place.  Further, Hall had received payment for the
> gun, and, ultimately, had given it to Roman. Moreover, Roman volunteered
> that he had, in fact, "stretched the truth" in Addison's trial, because he
> (Roman) had testified therein (contrary to what had happened) that he
> himself had actually presented the weapon to Addison.

(Docs. 66 at 16 and 66 at 16).[8]  The only aspect of Roman Pierce's testimony that is

discussed in Judge McKathan's affidavit is the testimony concerning the actual

*"transfer"* of the firearm, not the testimony concerning the *sale* of the firearm by Pierce

to Daniel Addison. In addition, as shown above, Addison's counsel advised this Court

---

[8] Addison's prosecutorial misconduct claim is predicated upon the portion of Judge McKathan's affidavit stating that, during a pretrial meeting with an unidentified Assistant United States Attorney and some other unidentified federal agent, Pierce "was told . . . that he should not lie, but that he should stretch the truth."  (Docs. 63 at 3 and 66 at 16).

that when he contacted Pierce by telephone, Pierce denied having recanted his testimony. (Doc. 29 at 2).

A.    Ineffective Assistance of Counsel.

Addison's claim of ineffective assistance of his counsel, F. Luke Coley, Jr., is now centered on two allegations: (1) "that counsel's action was deficient in his argument to this Court for a new trial, because Coley failed to obtain an affidavit from Judge McKathan to support his claim [and] failed to show how the perjured testimony was relevant and material"; and (2) "then, Coley failed to appeal this issue."   (Doc. 104 at 6). Addison argues that it was "not enough for Coley to bring Judge McKathan's information to this Court's attention" – "Coley needed to show how the new information would have affected the outcome of the trial."  (*Id*. at 8).

According to Addison, the relevance and materiality which his counsel failed to establish is as follows:

> Judge McKathan's affidavit showed that Pierce's statements to him were more than merely impeaching.  Pierce's statement to Judge McKathan were material to guilt.  Pierce's trial testimony placed the rifle's ownership/possession in Petitioner's hands.  Pierce's testimony allowed the jury to find the testimony of Justin Baker and George McIntyre to be credible, because Pierce had testified that he sold the rifle to Petitioner. Pierce's trial testimony showed that he sold the gun to Petitioner in the presence of  Hall, another Government's witness. Hall testified that he witnessed Pierce sell the rifle to Petitioner. Therefore, you had Pierce testifying that he sold the rifle to Petitioner, and Hall saying that he witnessed the transaction. This was powerful testimony and material to the jury's finding of guilt.

> Judge McKathan's affidavit concerning  Pierce's statements to him not only contradicts Pierce's trial testimony, but it also contradicts the trial testimony of Hall. If Pierce lied at Petitioner's trial about selling Petitioner the rifle and in the presence of Hall, then Hall lied about witnessing Pierce

17

> sell the rifle to Petitioner.  Pierce did not know who Hall sold the rifle to, because he was not present during the sale. Hall also testified that he gave Mrs. Stokes a receipt for the rifle showing that she had purchased the rifle from him, because he needed another title for his truck and giving her the receipt for the rifle was the only way he could obtain the title.

(*Id.*).   As stated previously, even if one accepts as true that Pierce lied when he said he physically handed the gun to Addison, *there is no evidence that Pierce lied about selling the gun to Addison for $200.*  Consequently, there is no evidence that Hall lied.  Addison simply stretches the affidavit testimony of Judge McKathan too far.

In addition, the record clearly reflects that Addison's counsel argued in the motion for a new trial  that "Mr. Pierce's statement to Judge McKathan goes directly to the issue of Mr. Addison's actual possession (at some point) of the gun [and] was therefore critical to the Government's case, in that Mr. Pierce was able to actually put the gun in Mr. Addison's hand and establish Mr. Addison's ownership thereof."  (Doc. 29 at 4) Addison's counsel further argued that "[t]here can be little doubt that evidence of actual ownership, if taken away, would probably result in a jury rejecting a constructive possession argument posed by the Government."  (*Id.*)  Counsel's argument, although challenging only Pierce's testimony, is indistinguishable from Addison's present argument regarding relevance and materiality.  Addison's additional challenge to Hall's veracity does not render counsel's performance ineffective.  As this Court correctly concluded:

> [D]efendant has failed to show that the outcome would be different should the impeaching evidence be presented at a new trial.  Although defendant argues that the recanting witness' trial testimony was material to the issue of whether defendant had actual possession or ownership of the gun, the United States' case was based upon constructive possession. In that regard,

the United States presented substantial evidence of defendant's constructive possession of the subject gun through the testimony of the investigators, the witness to the showing of the gun by defendant, and the testimony of defendant's step-father.

(Doc. 35 at 1-2). The Eleventh Circuit has made it very clear that:

> The Supreme Court has held a criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal. Jones v. Barnes, 463 U.S. 745, 751-54, 103 S.Ct. 3308, 3312-14, 77 L.Ed.2d 987 (1983). In so holding, the Court noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751-52, 103 S.Ct. at 3313. Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues. Smith v. Robbins, 528 U.S. 259, 287-88, 120 S.Ct. 746, 765-66, 145 L.Ed.2d 756 (2000).

Payne, 566 F.3d at 1277. For the reasons stated above, the undersigned concludes that Addison's counsel did not err in failing to raise these meritless claims on appeal.

Addison has failed to establish that, in connection with his motion for a new trial or any failure to appeal the denial of that motion, his counsel "performed outside the wide range of reasonable professional assistance and made errors so serious that he failed to function as the kind of counsel guaranteed by the Sixth Amendment." Butcher, 368 F.3d at 1293, *citing* Strickland, 466 U.S. at 689. In addition, Addison has failed to establish that any prejudice resulted from the alleged ineffective assistance of counsel. As stated above, "that the errors [are alleged to have had] some conceivable effect on the outcome of the proceeding' is insufficient to show prejudice." Butcher, 368 F.3d at 1293-94, *quoting* Gilreath v. Head, 234 F.3d 547, 551 (11th Cir. 2000). In view of the substantial evidence of record which supports Addison's conviction, even if Pierce's

testimony concerning his personal presentation of the SKS rifle to Addison were excluded, Addison cannot establish that "there is a reasonable probability that, but for counsel's unprofessional errors [alleged in connection with his motion for a new trial or any failure to appeal the denial of that motion], the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Consequently, Addison's habeas claim of ineffective assistance of counsel is due to be denied.

      B.      <u>Prosecutorial Misconduct</u>.

As stated previously, Addison's prosecutorial misconduct claim is a substantive claim which is essentially predicated on the portion of Judge McKathan's affidavit in which it is stated that Roman Pierce "was told . . . that he should not lie, but that he should stretch the truth." (Docs. 63 at 3 and 66 at 16). According to Addison, "Pierce did stretched [sic] the truth by lying" (doc. 104 at 11) but, as stated previously, the evidence proffered by Addison indicates only that Pierce may have lied about physically transferring the rifle to Addison but there exists no evidence that Pierce said he did not sell the rifle to Addison. Addison then simply presumes that "[t]he Government knew that Pierce and Hall were lying at Petitioner's trial and did nothing to correct the perjured testimony." *Id*. Addison theorizes that "Pierce lied to protect Hall" because Hall "was a convicted felon and could not be around firearms. . . [but] he [Hall] gave Mrs. Stokes a receipt showing that she purchased the rifle from [Hall]." *Id*. Addison further speculates that "[i]f Pierce lied to protect Hall, then the Government knew that Hall was lying too . . . [and] [t]he fact that the Government knowingly used perjured testimony was material to the determination of guilt, because the Government told the jury how important Pierce

and Hall's testimony was during opening and closing arguments." *Id*. Addison ignores, however, the other evidence of record which the Eleventh Circuit held was sufficient for a reasonable jury to find not only that Addison was in actual possession of the SKS refile on December 11, 2007, but that the rifle was in his constructive possession. (Doc. 69 at 8).

Addison's claim of prosecutorial misconduct was not raised on appeal because, by Addison's own admission, his counsel rejected Addison's request to do so because counsel had spoken directly with Pierce and Pierce had denied that he recanted his trial testimony. (Doc. 104 at 14). For the reasons stated above, Addison has failed to establish that his counsel's performance and strategy in connection with either his motion in this Court for a new trial or his prosecution of Addison's appeal was "outside the wide range of reasonable professional assistance" or that he "made errors so serious that he failed to function as the kind of counsel guaranteed by the Sixth Amendment." Butcher, 368 F.3d at 1293, *citing* Strickland, 466 U.S. at 689. Because Addison has failed to show that his counsel was ineffective at trial and appeal, Addison's claim regarding prosecutorial misconduct is procedurally defaulted. "[An] ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." Edwards v. Carpenter, 529 U.S. 446 (2000). Addison has failed to establish cause and prejudice to excuse the default of his prosecutorial misconduct claim.

The issue raised by Addison regarding the alleged recantation of testimony by witness Roman Pierce was addressed by this Court when it ruled that Addison had failed to meet his burden of showing that the "newly discovered evidence" warranted a new trial. (Doc. 35). Addison's counsel then raised a sufficiency of the evidence claim on direct appeal but did not raise a claim of prosecutorial misconduct. As stated previously, " if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a § 2255 challenge." <u>Montano</u>, 398 F.3d at 1279 (citation omitted). In light of the default, it is Addison's burden to establish cause for the default and "actual prejudice suffered as a result of the alleged error." *Id*. Addison has not and cannot meet this burden. Although ineffective assistance of counsel may under certain circumstances constitute cause for a procedural default of a claim,[9] Addison has failed to properly assert or support a claim of ineffective assistance of appellate counsel in his first habeas claim for the reasons stated above.

## IV. EVIDENTIARY HEARING.

No evidentiary hearing is needed because Addison's claims are due to be denied as a matter of law and are affirmatively contradicted by the record. <u>Aron v. United States</u>, 291 F.3d 708, 715 (11th Cir. 2002). Addison's claims are also otherwise capable of resolution based on the existing record. <u>Schultz v. Wainwright</u>, 701 F.2d 900, 901 (11th Cir. 1983). An evidentiary hearing is also unnecessary because Addison's claims "are merely conclusory allegations unsupported by specifics or contentions that in the

---

[9] *See* <u>Murray v. Carrier</u>, 477 U.S. 478, 488-89 (1986).

face of the record are wholly incredible." <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991); *see also* <u>Lynn v. United States</u>, 365 F.3d 1225, 1239 (11th Cir.), <u>cert</u>. <u>denied</u>, 534 U.S. 891 (2004); <u>Chandler v. McDonough</u>, 471 F.3d 1360, 1363 (11th Cir.), <u>cert</u>. <u>denied</u>, 127 S.Ct. 2269 (2007) (§ 2254 case citing "clear precedent" that conclusory allegations "are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support."). "[I]f the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous, a district court is not required to hold an evidentiary hearing." <u>United States v. Bejacmar</u>, 217 Fed.Appx. 919, 921 (11th Cir. 2007) (unpublished), *citing* <u>Aron</u>, 291 F.3d at 715).

## V.  <u>CERTIFICATE OF APPEALABILITY/*IN FORMA PAUPERIS*</u>

Pursuant to the changes to Rule 11 of the Rules Governing Section 2255 Proceedings which became effective December 1, 2009, the court addresses the appealability of the recommended denial of plaintiff's habeas petition.  "A [COA] may issue only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2).  To make such a showing, a defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (*quoting* <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further'," <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (*quoting* <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n. 4 (1983)).

In the undersigned's view, the issues Addison has raised in his motion are not sufficiently substantial to justify the issuance of a certificate of appeal.  Addison's

conviction is supported by substantial evidence *apart* from the testimony of Roman

Pierce.  Addison has failed to establish that his counsel's representation either at trial or

on appeal was in any manner deficient.  Addison's claim of prosecutorial misconduct is

procedurally defaulted and Addison has failed to establish the requisite cause and

prejudice to excuse that default.   Under the facts of this case, a reasonable jurist could

not conclude either that this Court is in error in denying the instant § 2255 motion or that

Addison should be allowed to proceed further.  Slack, 529 U.S. at 484 ("Where a plain

procedural bar is present and the district court is correct to invoke it to dispose of the

case, a reasonable jurist could not conclude either that the district court erred in

dismissing the petition or that the petitioner should be allowed to proceed further.").

Accordingly, the undersigned recommends that the Court conclude that no reasonable

jurist could find it debatable whether Addison's § 2255 motion should be denied; thus,

he is not entitled to a certificate of appealability.

Additionally, the undersigned here addresses the related issue of whether any

appeal of an order adopting this Report and Recommendation and denying habeas relief

may be brought *in forma pauperis*.  An appeal may not be taken *in forma pauperis* if the

trial court certifies in writing that the appeal is not taken in good faith. 28 U.S.C. §

1915(a)(3); *see* Fed.R.App. P. 24(a)(3)(A); Lee v. Clinton, 209 F.3d 1025, 1026 (7th

Cir.2000) (concluding that "good faith" is "an objective concept" and that "not taken in

good faith" is "a synonym for frivolous"); *DeSantis v. United Techs, Corp*., 15 F.Supp.2d

1285, 1288-89 (M.D .Fla.1998) (stating that good faith "must be judged by an objective,

not a subjective, standard" and that an appellant "demonstrates good faith when he seeks

appellate review of any issue that is not frivolous").  An appeal filed *in forma pauperis* is frivolous if "it appears that the Plaintiff has little to no chance of success," meaning that the "factual allegations are clearly baseless or that the legal theories are indisputably meritless." <u>Carroll v. Gross</u>, 984 F.2d 392, 393 (11th Cir.1993).  For the foregoing reasons, the undersigned recommends that the court find no possible good faith basis for appeal of the denial of the petitioner's habeas claims, and thus that no appeal of such a ruling may be brought *in forma pauperis*.

CONCLUSION

For the reasons set forth above, if is hereby **RECOMMENDED** that petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 be **DENIED**, and that no Certificate of Appealability should issue and no appeal  *in forma pauperis* be sanctioned.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this 21st day of March, 2011.

/s/ Katherine P. Nelson
KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE

# RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
# AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

**Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  *See* 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(en banc).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. ' 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation@ within [fourteen] days[10] after being served with a copy of the recommendation, unless a different time is established by order."  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party=s arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

Transcript (applicable where proceedings tape recorded).  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**Done** this 21ˢᵗ day of March, 2011.

/s/ Katherine P. Nelson
UNITED STATES MAGISTRATE JUDGE

---

[10] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).