# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| vs. | ) | CRIMINAL ACTION 08-00204-KD |
| DANIEL STUART ADDISON, | ) | |
| Defendant. | ) | |

## ORDER

This action is before the Court on defendant Daniel Stuart Addison's motion for new trial, memorandum in support and exhibits to the memorandum (docs. 144, 145). Upon consideration and for the reasons set forth herein, the motion is **denied**.

I. Background

In 2007, the Conecuh County Sheriff's Department was investigating the burglary of John Ralls' residence in September 2007 (doc. 145, p. 96, Ralls' theft report, Exhibit I-7). As part of the investigation of that burglary, Justin Baker gave a statement on December 6, 2007, that he, Daniel Addison and Mitzi Rabon, Addison's ex-wife, burglarized the Ralls' residence (doc. 145, p. 94, Exhibit I-6). The Sheriff's Department was also investigating a series of burglaries, auto burglaries, thefts, and auto thefts. On December 11, 2007, Investigator Sharon B. Caraway executed an affidavit in support of the application for a search warrant wherein she stated as follows:

> Justin Mitchell Baker (co-defendant) gave Inv. Sharon Caraway a written statement that he assisted Daniel Addison & Mitzi Rabon in a burglary located at the residence of John G. Ralls . . . Justin Baker stated that items from this burglary were taken to . . . Brewton, Al, a residence owned by Linda Stokes (mother of Daniel Addison). Some of these items have since been located at . . . Franklin Ave and other items have been allegedly moved to the residence of Linda & George Stokes at . . . Castleberry, Alabama by Daniel

> Addison and George McIntyre. George McIntyre advised Inv. Heath that he helped Daniel Addison move 2 recliners one of which has been confirmed as one stolen from the Ralls residence. Several other items that were stolen from the Ralls residence . . . are reportedly to be at the residence of Linda and George Stokes as well. These include: 1-Australian Kangaroo rug, 1 black and white cowhide rug, 1 antique dagger in sheath with eagle insignia, 1 mounted deer head, 1 tan Lazy Boy recliner, 1 DVD/VHS player, 1 light colored wood end-table with one drawer. Informants advised that Daniel Addison has also been involved in numerous other burglaries, auto burglaries, and thefts whereas the following items were stolen: jewelry, tools, electronics, and firearms. Said Informants state that several of these items are stored in a box-style yellow truck located at the rear of the residence.

(Doc. 145, p. 116, Exhibit J-16, affidavit).

The search warrant was issued for the items specified as well as "misc. tools, electronics, firearms, and jewelry" (doc. 145, p. 109, Exhibit J-13). The search was executed on December 11, 2007 at the Castleberry residence of George and Linda Stokes (doc. 145, p. 103-108, 120, Return and inventory, Exhibits J-6 through J-12, J-24). Items that had been stolen from the Ralls' residence as well as other stolen items were seized as evidence (*Id.*). Among the items seized was a black SKS assault rifle that was hidden in a shed on the property, rugs, and prescription medications in the name of someone other than Addison that were found in Addison's bedroom. (*Id.*)

Detective Sean Klaetsch reported the discovery of the assault rifle to Agent Bart Jeffrey of the Department of Justice Bureau of Alcohol Tobacco and Firearms. The ATF investigated further and interviewed two witnesses Lamar Hall and Roman Pierce (doc. 145, p. 135-136, emails between Jeffrey, Klaetsch, and Assistant United States Attorney John Cherry; p. 155-159, Letter to the Office of Professional Responsibility)

On May 29, 2008, Addison was indicted for the offense of felon in possession of a firearm (doc. 1). Trial was held in early August 2008. Investigator Caraway, Investigator

Vince Heath, Investigator Justin Douglas, Justin Baker, George McIntyre, Roman Pierce, Lamar Hall, Detective Klaetsch, and George Stokes, Summer Willis, Ramona Smith, and Linda Stokes testified. (doc. 51). On August 4, 2008, the jury found Addison guilty (Doc. 23-1, verdict form).

After trial, on November 13, 2008, Addison filed a motion for new trial based on the alleged recantation of testimony by witness Pierce (doc. 29). His motion was denied (doc. 35). On December 18, 2008, he was sentenced to a term of 120 months (doc. 38). On November 16, 2009, the conviction was affirmed on appeal (doc. 69).

Addison argued on appeal that the United States failed to establish that at the time of the search on December 11, 2007, he was in actual or constructive possession of the rifle or had control over the premises where it was found. The Eleventh Circuit held:

> A reasonable jury could have concluded that Addison was in knowing possession of a firearm in violation of § 922(g)(1). The government introduced evidence at trial tending to show that Addison had actual possession of the SKS rifle. George McIntyre, an acquaintance of Addison, testified that Addison showed him the rifle at Stokes' residence in December, 2007. The search warrant of Stokes' residence was executed on December 11, 2007 at which time the rifle was seized. Viewing the evidence in the light most favorable to the government, McIntyre's testimony suggested that Addison had physical possession of the rifle only days before the search warrant was executed and the rifle was seized. The government thus introduced evidence from which a reasonable jury could have found that Addison was in actual possession of the rifle "on or about" December 11, 2007 as charged in the indictment. *See* United States v. Pope, 132 F.3d 684, 689 (1998) (concluding that September 17, 1994 and October 4, 1994 were "reasonably near to October 7, 1994 so as to be 'on or about' that date").
>
> The government also introduced evidence at trial tending to establish that Addison had constructive possession of the SKS rifle. The evidence showed that at the time the search warrant was executed Addison at least maintained a bedroom at Stokes' residence and had access to the shed where the rifle was recovered. Based on that, a reasonable jury could have found that Addison "exercised ownership, dominion or control" over the SKS rifle or the shed where it was kept and thus it was within his constructive possession. Gunn, 369 F.3d at 1234. Accordingly, we affirm Addison's conviction.

(Doc. 69 at p. 4-5).

After the appeal, Addison filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1] The motion was denied and the denial was affirmed on appeal (docs. 109, 116, 127). He filed a second motion for new trial that was denied as untimely (doc. 136). Addison has now filed his third motion for new trial wherein he argues that his claims are based upon newly discovered evidence and that the equitable tolling doctrine applies (doc. 144; doc. 145 memorandum).

II. <u>Rule 33 of the Federal Rules of Criminal Procedure</u>

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). A "motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). "A new trial based on newly discovered evidence is warranted if the defendant satisfies a five-part test:

> (1) the evidence must be discovered following the trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result."

*United States v. Taohim*, - - - Fed. Appx. - - -2013 WL 3884232, *5 (11th Cir. July 30, 2013) (quoting *United States v. DiBernardo*, 880 F.2d 1216, 1224 (11th Cir.1989). "Failure to satisfy any one of those elements is fatal to a motion for a new trial." *Id*. (citing *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir.1995); *United States v. Brown*, 2013 WL

---

[1] Initially, Addison raised four issues but abandoned all except for ineffective assistance of counsel and whether the United States "knowingly used, solicited, or capitalized on perjured testimony from Roman Pierce and Lamar Hall during trial and during opening and closing statements." (Doc. 109, pgs. 15-25)

4

1760581, *3 (11th Cir. 2013) (slip copy) (citing *United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir.1995) ("Failure to meet any one of these elements will defeat a motion for a new trial.")). Overall, "[m]otions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." *Brown*, at *3 (quoting *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir.2006) (*en banc*)).

III. Equitable tolling

Addison filed his motion more than three years after the jury entered the verdict of guilty on August 4, 2008. Addison argues that the time period has been equitably tolled because extraordinary circumstances prevented him from obtaining the newly discovered evidence. In *United States v. Ramsey*, 444 Fed. Appx. 356 (11th Cir. 2011), the circuit court stated that

> A district court "may vacate any judgment and grant a new trial" in a criminal case "if the interest of justice so requires." Fed.R.Crim.P. 33(a). However, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). Assuming arguendo that equitable tolling applies to the time limitations under Rule 33, it is a remedy that must be used sparingly. *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000). Equitable tolling of a limitations period is warranted "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." Id. (quotation omitted).

*Ramsey*, 444 Fed. Appx, at 358.

In *Holland v. Florida*, 560 U.S. - - - , 130 S. Ct. 2549 (2010), the Supreme Court explained that the "diligence required for equitable tolling purposes is reasonable diligence not maximum feasible diligence." *Id*. at 2565 (internal quotations and citations omitted).

5

However, "[e]quitable tolling is a rare and extraordinary remedy" that calls upon the court to exercise its equitable powers "on a case-by-case basis." *Lucas v. United States*, - - - Fed. Appx. - - - , 2013 WL 2985800, *2 (11th Cir. June 17, 2013) (citing *San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir.), *cert. denied*, --- U.S. ----, 132 S.Ct. 158 (2011)). Also, there "must be a causal connection between the alleged extraordinary circumstances and the late filing of the motion." *Lucas*, at *2 (citing *San Martin*, 633 F.3d at 1267.

The Court does not find that Addison meets the requirements for equitable tolling as there are no extraordinary circumstances that prevented Addison from presenting the alleged "newly discovered evidence" in a timely manner.

IV. <u>Newly discovered evidence grounded on Judge Ashley McKathan's affidavit</u>

Addison alleges that in 2009, while his appeal was pending, "he heard rumors that a key government witness against him had recanted his testimony" to Alabama Circuit Court Judge Ashley McKathan. On June 25, 2009, he wrote Judge McKathan (doc. 145, p. 4-5, Section II; Exhibit A-1, letter). After their correspondence, Judge McKathan executed an affidavit on August 27, 2009, wherein he states as follows:

> The day after Roman returned from the trial in Mobile, he was riding with me on the way to his job at Jesse James' farm. He then related to me that, before he testified in Mobile, he discussed the testimony he would give with an Assistant United States Attorney and some other federal agents. He said he was told, in that discussion, that he should not lie, but that he should stretch the truth. He said this remark was made with respect to the testimony that I will reference in the following paragraph.
>
> During the abovementioned ride to work, Roman told me that: He was not present when Daniel Addison took possession of the firearm involved in the above prosecution, because he (Roman) had gone to work. Instead, Roman believed that one Lamar Hall, a friend of his, had made the transfer to Addison in his place. Further, Hall had received the payment for the gun, and, ultimately, had given it to Roman. Moreover, Roman volunteered that he had, in fact, "stretched the truth" in Addison's trial,

6

> because he (Roman) had testified therein (contrary to what had happened) that he himself had actually presented the weapon to Addison.

(Doc. 145, p. 39, affidavit dated August 27, 2009).

Relying on Judge McKathan's post-trial affidavit that Roman Pierce told him that the Assistant United States Attorney and the Agents asked him to "stretch the truth" (doc. 145, p. 3-5, Section II-1), Addison argues that the prosecution knew or should have known of Pierce's perjury and knowingly used the perjured testimony in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972) (doc. 145, p. 26, Sections VI and VII). Addison also argues that because of Pierce's statement that the AUSA and the Agents asked him to "stretch the truth", the AUSA "illegally vouched for the credibility" of Pierce during closing arguments by stating that Pierce did not "have a dog in this fight" (doc. 145, p. 28-29, Section IX).

In November 2008, Addison filed a motion for new trial based upon Roman Pierce's alleged recantation. In that motion, Addison's counsel states that on October 17, 2008, he contacted Pierce by telephone, told Pierce that he had been led to believe that he had recanted his testimony, but Pierce "denied having recanted his testimony." (doc. 29, p. 2). Counsel did not find Pierce's statement credible "as compared to Judge McKathan's statement" (*Id.*). The motion was denied. The Court explained that although Addison argued that the recanted testimony was material to the issue of his actual possession or ownership of the rifle, the United States' case was also based upon constructive possession, and there was substantial evidence of Addison's constructive possession such that Addison had failed to meet his burden of showing that there would have been a different outcome should the impeaching evidence be presented at a new trial (doc. 35).

7

Additionally, Addison raised the issue of whether the United States "knowingly used, solicited, or capitalized on perjured testimony from Roman Pierce and Lamar Hall during trial and during opening and closing statements" in his 28 U.S.C. § 2255 motion to vacate and attached Judge McKathan's affidavit as an exhibit (docs. 65; 66, p. 16; doc. 95). The motion was denied (docs. 109, 116).

Thus, this information is not newly discovered evidence and the Court has already thoroughly considered this information in the order denying Addison's first motion for new trial (doc. 35) and Addison's habeas petition (docs. 109, 116).

V. Newly discovered evidence resulting from Judge McKathan's affidavit

A. George McIntyre's Affidavit

Addison states that on September 1, 2009, after he received Judge McKathan's affidavit, he began to correspond with witness George McIntyre to find out whether the AUSA or the Agents asked McIntyre to "stretch the truth" in his trial testimony (doc. 145, p. 5, Section 11-2; doc. 145, p. 32, Section XIII). At trial, McIntyre testified that Addison was living with his mother Linda Stokes in December 2007 and that early that month, when he and Addison were at her residence, Addison showed him the rifle (doc. 51, p. 51-52). After corresponding with Addison, McIntyre signed an affidavit on May 7, 2012,[2] wherein he states that at the time of his trial testimony he believed that Addison was living with his mother in December 2007, but then states that "upon review of the Documents, Dates and Recollections, it is no way that in October, November or December 2007 that Daniel was

---

[2] The copy is not complete. Only the page with the notary attestation was filed (doc. 145, p. 48, Exhibit B-5). However, the Court received a copy of the affidavit when Addison filed his second motion for new trial (doc. 132, p. 26). Addison also filed two copies of an affidavit dated February 22, 2012 wherein McIntyre made the same statement (docs. 128, 130).

8

living with his mother, therefore, I cannot honestly remember if it was Daniel or Blake[3] that showed me the gun." (*Id*). McIntyre makes no statement as to whether the AUSA or the Agent asked him to "stretch the truth."

Addison argues that he "exercised due diligence in attempting to discover and obtain" McIntyre's recantation by repeatedly corresponding with McIntyre. He argues that extraordinary circumstances beyond his control even with due diligence, specifically McIntyre's slow response to Addison's letters and McIntyre's failing to sign an affidavit until May 2012, entitle him to equitable tolling (doc. 145, p. 5-6; p. 32, Section XIII; Exhibits B-1 through B-5, correspondence).

Addison was aware of Pierce's recantation as early as November 13, 2008 when he filed his first motion for new trial, but ten months passed before his first letter to McIntyre on September 1, 2009. In his first letter to McIntyre, sent soon after receipt of Judge McKathan's affidavit, Addison asks: "Did the AUSA Mr. Cherry or AUSA Ms. O'Brien also talk with you before my trial? If they talked with you did they ask you to stretch the truth also?" (doc. 145, p. 41, Exhibit B-1). Then, Addison allowed four months to pass between his first and second letter and eighteen-months between his second and third letter.[4] Thus, the Court finds that Addison has not met his burden of showing that he exercised reasonable

---

[3] Blake is Addison's minor son. He was twelve years old at the time of trial in 2008 and lived with his grandmother Linda Stokes (doc. 51, Linda Stokes' trial testimony, p. 113).

[4] Four months later, Addison wrote McIntyre in January 2010, stating "the reason I wrote and sent you [Judge McKathan's] affidavit is because I wanted you to review the information and let me know if it also applied to what you testified to at my trial" (doc. 145, p. 42, Exhibit B-2). Eighteen months later, on July 7, 2011, Addison wrote McIntyre and enclosed "all the information" that he had requested – "Jail Records, Trial Transcript, and all the letters [Addison] wrote to the City of Evergreen and Town of Castleberry on trying to get information" and "the reports in 2008 from case nos. 07-12-057, 07-12-025" (doc. 145, p. 43, Exhibit B-3). Addison asked: "Upon your review I hope you will provide a (*sic*) affidavit to your conclusion." (*Id*). McIntyre signed his affidavit on May 7, 2012.

diligence in obtaining McIntyre's affidavit. *See Holland*, 130 S. Ct. at 2565 (the "diligence required for equitable tolling purposes is reasonable diligence . . . not maximum feasible diligence.")

However, assuming for purpose of this motion, that Addison could show the requisite reasonable diligence, McIntyre's affidavit is not evidence "such that a new trial would probably produce a different result." *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003). To the extent that McIntyre now questions his memory as to whether Addison or Addison's twelve-year old son Blake showed the rifle to him, this evidence "does not rise to the level for a new trial to be granted." *United States v. Shaw,* 482 Fed. Appx. 449, 453 (11th Cir. 2012) (finding that witness' alleged post-trial statement that he did not know defendant, after testifying that he bought drugs from defendant, "merely tended to impeach [the witness' testimony], which does not rise to the level for a new trial to be granted.").

The Eleventh Circuit Court of Appeals cited McIntyre's testimony that he saw Addison with the rifle in early December 2007 as sufficient evidence of actual possession. However, the Circuit Court also explained that there was sufficient evidence that "at the time the search warrant was executed Addison at least maintained a bedroom at Stokes' residence and had access to the shed where the rifle was recovered. Based on that, a reasonable jury could have found that Addison 'exercised ownership, dominion or control' over the SKS rifle or the shed where it was kept and thus it was within his constructive possession" (doc. 69). Therefore, McIntyre's recanted testimony[5] is not likely to produce a

---

[5] Also, McIntyre's recanted testimony that Addison did not live with his mother in December 2007 is arguably cumulative to the trial testimony of Addison's former girlfriend Summer Willis and her mother Ramona Smith. They testified at trial that Addison began

10

different result because Addison "at least maintained a bedroom and had access to the shed where the rifle was recovered." (*Id*).[6]

B. <u>Newly discovered evidence from Addison's case file for the state offense of felon in possession of a firearm</u>

Addison states that in "light of the information . . . contained in the affidavit from Judge McKathan" which he received August 30, 2009, he wrote the City of Evergreen Police Department and the City Clerk on April 10 2010, and requested "all the information they had pertaining to him" (doc. 145, p. 8, p. 24; doc. 145, p. 51, Exhibit D-1). For months thereafter, Addison wrote to officials of the City of Evergreen and the City of Castleberry, including a letter in March 2012 to Richard Hartley, City Attorney for the City of Evergreen, asking for copies of his case file or for any other relevant documents. Then on May 31, 2012, Hartley sent Addison the case file from the City of Evergreen Police Department for file number 07-12-057, which also contained a copy of the investigation report for the City of Castleberry (doc. 145, p. 97-149, Exhibits J-1 through J-53).

Based on the contents of his case file, Addison argues that he has newly discovered evidence that the search warrant was defective and that the rifle was illegally seized in

---

living with them in October 2007 and that he did so "[u]ntil he got locked back up" in January 2008 (doc. 51, transcript, p. 94-95; 101-102). *See Jernigan*, 341 F.3d at 1287 (to obtain a new trial, a defendant must show, among other requirements, that the new evidence was "not merely cumulative or impeaching," was "material to issues before the court" and "would probably produce a different result").

[6] Addison's mother Linda Stokes testified that Addison maintained a bedroom at her home (doc. 51, p. 113-114). His stepfather George Stokes testified that Addison lived with them "off and on" (doc. 51, p. 115). Justin Baker, Addison's co-defendant in the Ralls' burglary, testified that Addison showed him the rifle at the Stokes' residence in August 2007 (doc. 51, p. 42-43, 46).

11

violation of the Fourth Amendment (doc. 145, p. 8-19, Section III).[7] First, the search warrant is not newly discovered evidence that would have had any effect on the trial nor has it been shown that it could not have been obtained in a timely manner.[8] Moreover, to the extent Addison challenges the veracity of the statements in the affidavit to obtain the search warrant, "a request for a new trial on the basis of newly discovered evidence that allegedly impeaches, or tends to impeach, statements made in the search warrant affidavit, . . . fails because impeachment evidence will not support a new trial claim." *Davidson v. United States,* 138 Fed. Appx. 238, 239-240 (11th Cir. 2005) (addressing the claim in the context of a § 2255 motion) (citations omitted).

---

[7] Among several defects in the search warrant, Addison argues that the search warrant was for "stolen" firearms and since the rifle was not stolen, it was illegally seized. He also argues that the search warrant lacked particularity because it did not describe the rifle when the deputies were searching for that specific rifle. He also argues that the search warrant lacked specificity and that there were no exigent circumstance to excuse the lack of specificity because Investigator Caraway had time to review the burglary reports and describe the stolen items in the search warrant instead of using non-specific words like "jewelry" and "firearms." Addison also asserts that Justin Baker was the "source of information" upon which Investigator Caraway "based her belief and probable cause to seek a warrant" and argues that Baker's statement did not contain any reference to "firearms", "jewelry" etc. (doc. 145, p. 16). Although Caraway did rely upon Baker's statement in her affidavit, she also relied upon statements from George McIntyre. She found that the "informants advised that Daniel Addison has also been involved in numerous other burglaries, auto burglaries and thefts where the following items were stolen: jewelry, tools, electronics and firearms" and that the informants had "seen items such as this at the residence of Daniel Addison's mother" (doc. 145, p. 112, Exhibit J-16, Affidavit in support of the Search Warrant).

[8] In May 2009, Kevin McKinley sent Addison a copy of his case file for the burglary, 2008-0001900. Addison did not write to McKinley again until August 11, 2011, which was two years and three months later and after the three-year limitation period had passed on August 4, 2011 (doc. 145, Exhibit I-2, p. 90). *See Lopez*, 512 Fed. Appx. at 1003 (finding that "the earliest specific date that [Lopez] wrote to his attorney was July 8, 2010, nearly eleven months into the one-year statute of limitation" and affirming the district court's decision that Lopez had not been reasonably diligent).

Addison also claims that there was prosecutorial misconduct[9] that the prosecutor "illegally became involved" as an investigator [10] and that the prosecution manufactured evidence[11] (doc. 145, p. 20-24, 27, 29, Section IV, V, VIII, X). These allegations are meritless. Also, they do not constitute newly discovered evidence and are untimely. Moreover, the "manufactured evidence" argument has already been considered by this court.

VII. <u>Other newly discovered evidence</u>

A. <u>Clarification of George Stokes' Testimony -Affidavit of July 9, 2012</u>

---

[9] Also, in a section captioned "Newly Discovered Evidence of Prosecutorial Misconduct" there are no allegations of prosecutorial misconduct on the part of the AUSAs in this action. The section is a chronology of the letters Addison wrote, beginning April 12, 2010, in an attempt to obtain the case file.

[10] Addison argues that on April 11, 2012, he learned that AUSA John Cherry "illegally became involved" as an "investigator" before Addison was indicted. He bases this argument on an email from Cherry to ATF agent Jeffrey - "I remember the Addison case from our conversation riding back from Montgomery a few weeks ago." (Doc. 145, p. 27; 145, p. 135, Exhibit J-39). "A few weeks ago" places the conversation before Cherry was assigned the case on May 6, 2008. Addison relies upon *Holden v. Sticher*, 424 Fed. Appx. 747 (11th Cir. 2011) where a district attorney gave advice to law enforcement before an arrest warrant was issued. However, *Holden* addressed the role of the prosecutor as dispositive of the affirmative defense of absolute immunity. Generally, the prosecutor's role is not limited to that of an advocate and the prosecutor may assist, direct or otherwise participate in investigations with the case agents before an indictment is entered. *Imbler v. Pachtman*, 424 U.S. 409, 424, 96 S. Ct. 984, 992 (1976). The *Holden* case explained that absolute immunity may not be available as an affirmative defense when a prosecutor is not functioning in the role of an advocate.

[11] Addison argues that an email from AUSA Cherry to ATF Agent Jeffrey is newly discovered evidence that Cherry "manufactured evidence" in violation of Addison's right to due process. Addison argues that Cherry "was a party to any means to make sure" Addison was convicted. Based on the email and Pierce's alleged recantation, Addison asserts that Cherry was the AUSA who asked Roman Pierce to "stretch the truth" and thus manufactured evidence that Pierce put the rifle in Addison's hands (doc. 145, p. 29, p. 135-136, Exhibits J-39 and J-40). However, Cherry's email does not mention Pierce. Instead, Cherry asks ATF Agent Jeffrey to interview Lamar Hall in regard to Linda Stokes' statement that she bought the rifle from Hall.

13

Addison provides his stepfather George Stokes' affidavit dated July 9, 2012, purportedly to clarify Stokes' trial testimony (doc. 145, p. 50, Exhibit C). He testified in relevant part as follows:

> Q. Where was [the firearm] at the house?
> A. At the time I saw it it was on the kitchen table.
> Q. . . .
> Q. Who was present?
> A. Well, it was me and Linda. And I think Daniel had come in. Blake was there.

(Doc. 51, p. 116-117, trial transcript).

In the affidavit, George Stokes states that the United States' is "piling inference on inference and speculating my testimony by stating that: I saw the gun at my house on the table with Daniel present" (doc. 145, p. 50, Exhibit C). He then states: "In clarification, let me say clearly that I do not know for a fact that it was Daniel that was there that day or had come in" (*id.*). [12]

Addison argues that George Stokes 'clarification impeaches not only his trial testimony but also that of Justin Baker who also testified that Addison showed him the rifle (doc. 145, p. 6-7, Section II-3; doc. 51, p. 42-43, 46, trial transcript). However, Addison has failed to make any showing that he exercised reasonable diligence to obtain the affidavit. A period of almost four years passed between his conviction on August 4, 2011 and Stokes'

---

[12] In support, Addison cites to the United State' response to the first motion for new trial, appeal brief, and response to the § 2255 motion. In the response to the first motion for new trial, the United States argued that despite the recantation of Pierce's testimony, it had "presented substantial evidence of [Addison's] constructive possession" of the rifle and included among that evidence "the testimony of George Stokes . . . that he saw the gun at his house on the table with the defendant present" (doc. 34, p. 4). Stokes now seeks to clarify that he thought Addison was present, not that he was certain Addison was present. Stokes' references the post-trial argument of counsel. However, the jurors heard Stokes' trial testimony and they could weigh any uncertainty created by his response - "And I think Daniel had come in" - in reaching their decision.

14

affidavit. Addison presents no evidence of any attempt to obtain George Stokes' affidavit at any time before July 2012. Thus, there is no basis upon which the Court could find that Addison's failure to timely present this evidence was equitably tolled. *See Ramsey*, 444 Fed Appx at 358 ("As the record shows, the alleged newly discovered evidence arose out of co-conspirator Dorsey's July 13, 2007 statement, but Ramsey did not explain why he did not receive this evidence until June 2009 or why he could not have obtained it sooner and still moved for a new trial within the three year period, or by August 3, 2008. As a result, the district court did not err in concluding that equitable tolling did not apply.") Moreover, George Stokes' "clarification" is not evidence "such that a new trial would probably produce a different result." *Jernigan*, 341 F.3d at 1287.

     B. <u>Linda Stokes' affidavit of February 7, 2012</u>

Addison provides Linda Stokes' affidavit dated February 7, 2012, purportedly to clarify her testimony (doc. 145, p. 30-32, Section XII; p. 160, Exhibit M-1, affidavit). Linda Stokes testified that when the officers executed the search warrant she "showed Officer Caraway where [Addison's] bedroom was" and that the officers searched the bedroom (doc. 51, p. 107). She also testified that the officers "wanted to know where his room was at. So, I showed them"(doc. 51, p. 110). When asked "Did they find some things in Daniel's room?" Stokes answered "Yes" and described the items (doc. 51, p. 111). She also explained that her bedroom was about "fifty-five feet from Daniel's bedroom" (*Id*).

In the affidavit, Linda Stokes clarifies that she used the phrase "'His Room" as a "figure of speech as in it used to be his room many years ago" (doc. 145, p. 160, Exhibit M-1). She also states that Addison did not live with her in December 2007 when the search was conducted or in the months before. (*Id*).

15

Addison has failed to make any showing that he exercised reasonable diligence to obtain the affidavit. *See Ramsey*, 444 Fed Appx at 358. A period of three and a half years passed between his conviction and the affidavit and Addison presented no evidence of any attempt to obtain Linda Stokes' affidavit at any time before February 2012. Thus, there is no basis upon which the Court could find that Addison's failure to timely present this evidence was equitably tolled. Moreover, Linda Stokes' affidavit is not evidence such that it would likely produce a different result if a new trial were granted and it is at most impeachment evidence.

C. <u>The prosecution's alleged vouching or bolstering the testimony of Justin Baker</u>

Addison argues that the AUSA "illegally vouched for the credibility" of Justin Baker during closing arguments when the AUSA stated that Baker "had no dog in this fight" (doc. 145, p. 28-29, Section IX; doc. 51, p. 122). Addison asserts that because Baker was a co-defendant in the underlying state court action for the burglary of the Ralls' residence, he did have an interest in this litigation. However, the alleged illegal vouching and bolstering and Baker's status as a co-defendant are not newly discovered evidence.

VII. <u>Conclusion</u>

Upon consideration, and for the reasons set forth herein, Addison's motion for new trial is DENIED.

Done this the 20th day of August 2013.

                                          s/ Kristi K. DuBose
                                          KRISTI K. DuBOSE
                                          UNITED STATES DISTRICT JUDGE